# Exhibit A

Docusign Envelope ID: 12DC21F2-3DAA-441B-B6C9-2E6C5856807C

| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br><br>Address:<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED<br>November 7, 2025 5:29 PM<br>FILING ID: 5ADF5A50C7679<br>CASE NUMBER: 2025CV34026 |
|---|---|
| **Plaintiffs:**<br><br>**LINDA KILKENNY and LITA A. McKAY,**<br><br>v.<br><br>**Defendants:**<br><br>**AIRBUS AMERICAS, INC.; AIRBUS S.A.S.; AIRBUS S.E.; HONEYWELL INTERNATIONAL, INC.; HONEYWELL AEROSPACE US INC.; HONEYWELL AEROSPACE US LLC; HONEYWELL AEROSPACE TECHNOLOGIES; and FRONTIER AIRLINES, INC.** | ☐ COURT USE ONLY ☐ |
| Attorneys for Plaintiffs:<br>Loren M. Brown, #34837<br>CIANCIO CIANCIO BROWN, P.C.<br>1660 Lincoln Street, Suite 2000<br>Denver, CO 80264<br>Phone: (303) 451-0300<br>Fax: (303) 464-8000<br>E-Mail: lorenbrown@colo-law.com | Case Number: |
| **DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT AND JURY DEMAND** | |

1. This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross-claim or third party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases or in Water (CW) proceedings subject to sections 37-92-302 to 37-92-305, C.R.S. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

ocusign Envelope ID: 12DC21F2-3DAA-441B-B6C9-2E6C5856807C

2. Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

❑ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

■ This party is seeking a monetary judgment against another party of more than $100,000.00, exclusive of interest and costs, as supported by the following certification:

By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000.

**Or**

❑ Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

3. ■ This party makes a **Jury Demand** at this time and pays the requisite fee. *See* C.R.C.P. 38. (Checking this box is optional.)

**Date: November 7, 2025**

*Linda Kilkenny*

**Linda Kilkenny**
**PLAINTIFF**

**CIANCIO CIANCIO BROWN, P.C.**

*/s/ Loren M. Brown*

**Loren M. Brown, #34837**
**ATTORNEY FOR PLAINTIFF**

**NOTICE**
This cover sheet must be served on all other parties along with the initial pleading of a complaint, counterclaim, cross-claim, or third party complaint.

Docusign Envelope ID: 96320BC2-023D-421E-A9CF-96E345EC88F1

DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO

~~DATE FILED~~
November 7, 2025 5:29 PM
FILING ID: 5ADF5A50C7679
CASE NUMBER: 2025CV34026

Address:
1437 Bannock Street
Denver, CO 80202

☐ COURT USE ONLY ☐

**Plaintiffs:**

**LINDA KILKENNY and LITA A. McKAY,**

v.

**Defendants:**

**AIRBUS AMERICAS, INC.; AIRBUS S.A.S.; AIRBUS S.E.; HONEYWELL INTERNATIONAL, INC.; HONEYWELL AEROSPACE US INC.; HONEYWELL AEROSPACE US LLC; HONEYWELL AEROSPACE TECHNOLOGIES; and FRONTIER AIRLINES, INC.**

Attorneys for Plaintiffs:
Loren M. Brown, #34837
CIANCIO CIANCIO BROWN, P.C.
1660 Lincoln Street, Suite 2000
Denver, CO 80264
Phone: (303) 451-0300
Fax: (303) 464-8000
E-Mail: lorenbrown@colo-law.com

Case Number:

**DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT AND JURY DEMAND**

1. This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross-claim or third party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases or in Water (CW) proceedings subject to sections 37-92-302 to 37-92-305, C.R.S. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2. Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box

ocusign Envelope ID: 96320BC2-023D-421E-A9CF-96E345EC88F1

below if this party asserts that C.R.C.P. 16.1 **does not** apply):

❑ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

■ This party is seeking a monetary judgment against another party of more than $100,000.00, exclusive of interest and costs, as supported by the following certification:

> By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000.

**Or**

❑ Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

3. ■ This party makes a **Jury Demand** at this time and pays the requisite fee. *See* C.R.C.P. 38. (Checking this box is optional.)

**Date: November 7, 2025**

_____
**Lita A. McKay**
**PLAINTIFF**

**CIANCIO CIANCIO BROWN, P.C.**

*/s/ Loren M. Brown*

_____
**Loren M. Brown, #34837**
**ATTORNEY FOR PLAINTIFF**

**NOTICE**
This cover sheet must be served on all other parties along with the initial pleading of a complaint, counterclaim, cross-claim, or third party complaint.

| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br><br>Address:<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED<br>November 7, 2025 5:29 PM<br>FILING ID: 5ADF5A50C7679<br>CASE NUMBER: 2025CV34026 |
|---|---|
| **Plaintiffs:**<br><br>**LINDA KILKENNY and LITA A. McKAY,**<br><br>**v.**<br><br>**Defendants:**<br><br>**AIRBUS AMERICAS, INC.; AIRBUS S.A.S.; AIRBUS S.E.; HONEYWELL INTERNATIONAL, INC.; HONEYWELL AEROSPACE US INC.; HONEYWELL AEROSPACE US LLC; HONEYWELL AEROSPACE TECHNOLOGIES; and FRONTIER AIRLINES, INC.** | **▲ COURT USE ONLY ▲** |
| Attorneys for Plaintiff:<br>Loren M. Brown, #34837<br>CIANCIO CIANCIO BROWN, P.C.<br>1660 Lincoln Street, Suite 2000<br>Denver, Colorado 80264<br>Telephone: (303) 451-0300<br>Fax: (303) 464-8000<br>E-mail: lorenbrown@colo-law.com | Case No.:<br><br>Division:    Courtroom: |
| **DISTRICT COURT CIVIL SUMMONS** | |

## TO THE ABOVE-NAMED DEFENDANT: AIRBUS AMERICAS, INC.

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within 35 days after such service upon you. Your answer or counterclaim must be accompanied with the applicable filing fee.

1

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

DATED on this 7th day of November, 2025.

Respectfully Submitted,

*Original signature on file at the law offices of
Ciancio Ciancio Brown, P.C.*

*/s/ Loren M. Brown*

Loren M. Brown, #34837
Ciancio Ciancio Brown, P.C.
ATTORNEY FOR PLAINTIFF

| | DATE FILED |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br><br>Address:<br>1437 Bannock Street<br>Denver, Colorado 80202 | November 7, 2025 5:29 PM<br>FILING ID: 5ADF5A50C7679<br>CASE NUMBER: 2025CV34026 |
| **Plaintiffs:**<br><br>**LINDA KILKENNY and LITA A. McKAY,**<br><br>**v.**<br><br>**Defendants:**<br><br>**AIRBUS AMERICAS, INC.; AIRBUS S.A.S.; AIRBUS S.E.; HONEYWELL INTERNATIONAL, INC.; HONEYWELL AEROSPACE US INC.; HONEYWELL AEROSPACE US LLC; HONEYWELL AEROSPACE TECHNOLOGIES; and FRONTIER AIRLINES, INC.** | |
| Attorney for Plaintiffs:<br>Loren M. Brown, #34837<br>CIANCIO CIANCIO BROWN, P.C.<br>1660 Lincoln Street, Suite 2000<br>Denver, Colorado 80264<br>Phone: 303-451-0300<br>Fax: 303-464-800<br>E-Mail: lorenbrown@colo-law.com | Case Number:<br><br>Division:<br><br>Courtroom: |
| **COMPLAINT AND JURY DEMAND** | |

## INTRODUCTION

1.     This lawsuit arises out of the November 9, 2023, fume event that occurred on the Frontier Flight number 990 from Denver, Colorado to San Antonio in an Airbus A320-200N, bearing FAA registration N303FR.

2.    This case is brought by two of the flight attendants on board the subject flight, who received personal injuries and damages as a result of the fume event.

## THE PARTIES

### *Plaintiffs*

3.    Plaintiff Linda Kilkenny resides at 267 Castaway Drive, Bluffton, South Carolina 29910.

4.    Plaintiff Lita A. McKay resides at 1568 Sorenson Drive, Windsor, Colorado 80550.

### *Airbus Defendants*

5.    Defendant Airbus Americas, Inc. is a Delaware Corporation with a principal place of business at 2550 Wasser Terrace, Suite 9100, Herndon, Virginia 20171, and is a wholly owned subsidiary of Airbus S.A.S.

6.    Defendant Airbus Americas, Inc. designs, produces, manufactures, and delivers commercial aircraft to its customers in the United States, including Frontier.

7.    Defendant Airbus Americas, Inc. assembles and delivers aircraft in Alabama.

8.    Airbus Americas Engineering, Inc. designed aircraft components in Mobile, Alabama, and Wichita, Kansas.

9.    Airbus Americas Engineering, Inc. was merged into Airbus Americas, Inc. on December 31, 2017.

10.    Defendant Airbus Americas, Inc. is the successor-in-interest to Airbus Americas Engineering, Inc.

11.    Defendant Airbus S.A.S. is a French corporation with a principal place of business at 2, Rond-Point Emile Deqoitine, 31700 Blagnac, France.

2

12.    Defendant Airbus S.A.S. designs, manufactures, assembles, services, and sells civil commercial aircraft, including the Airbus A320 family of aircraft (including the Airbus A319, A320, A321 and variants of each) to customers in the United States and across the world.

13.    Defendant S.A.S. is also the Type Certificate Holder for the Airbus A320 family of aircraft.

14.    Defendant Airbus S.E. is a multinational aerospace corporation, based in Leiden, the Netherlands, with a principal place of business at 2, Rond-Point Emile Deqoitine, 31700 Blagnac, France.

15.    Airbus S.E. operates through its Commercial Aircraft, Defense and Space, and Helicopters divisions with more than one hundred subsidiaries and affiliated entities located in more than 41 countries around the world.

16.    Airbus S.E. is the ultimate parent company of the Airbus Defendants.

17.    Airbus S.E., itself and through its subsidiaries and affiliates, has engaged in substantial and non-isolated business activity on a continuous and systemic basis in the United States and in this State.

18.    Defendants Airbus Americas, Inc., Airbus S.A.S., and Airbus S.E. are collectively referred to herein as the "Airbus Defendants."

19.    The Airbus Defendants hold themselves out to the public as "Airbus," and acted in concert with each other, as corporate alter egos, successors-in-interest, predecessors-in-interest, as joint venturers, as agents, as an enterprise, and/or otherwise collaborated in the design, manufacture, and sale of the subject aircraft.

3

20.    The Airbus Defendants assumed responsibility for providing inspection, repair, services, maintenance, replacement, overhaul, repair, warnings, parts, maintenance manuals, maintenance instructions, instructions for continuing airworthiness, and other information with respect to aircraft they design, manufacture, sell, and for which they hold the Type Certificate and Production Certificate.

21.    The Airbus Defendants participated in the ongoing coverup to shield the defects in their aircraft that causes dangerous fume events that hurt those who fly aboard its aircraft, and failed to correct known defects in their aircraft.

## *Honeywell Defendants*

22.    Defendant Honeywell International, Inc. is a Delaware Corporation with its principal place of business at 855 S. Mint Street, Charlotte, North Carolina 28202.

23.    Defendant Honeywell Aerospace US Inc. is a Delaware Corporation with its principal place of business in Phoenix, Arizona and a registered agent at 7955 S. Priest Drive, Suite 102, Tempe, Arizona 85284.

24.    Defendant Honeywell Aerospace US LLC is a Delaware Corporation with its principal place of business at 1944 E. Sky Harbor Circle North, Phoenix, Arizona 85034 and a registered agent at 7955 S. Priest Drive, Suite 102, Tempe, Arizona 85284.

25.    Defendant Honeywell Aerospace US Inc. is now known as Honeywell Aerospace US LLC.

26.    Defendant Honeywell Aerospace US LLC is the successor-in-interest to Defendant Honeywell Aerospace US Inc.

4

27.    Defendant Honeywell Aerospace US LLC does business as Honeywell Aerospace Technologies, which also maintains its principal place of business at 7955 S. Priest Drive, Suite 102, Tempe, Arizona 85284.

28.    Defendants Honeywell International, Honeywell Aerospace US Inc., Honeywell Aerospace US LLC, and Honeywell Aerospace Technologies are collectively referred to herein as the "Honeywell Defendants."

29.    The Honeywell Defendants acted in concert with each other, as corporate alter egos, successors-in-interest, predecessors-in-interest, joint venturers, as agents, as an enterprise, and/or otherwise collaborated in the design, manufacture, and sale of the subject APUs.

30.    The Honeywell Defendants manufacture of the auxiliary power units ("APUs") that are used in the Airbus 319 and A320 family of aircraft, including the Airbus 320 and 321 models.

31.    The Honeywell Defendants also coordinated in the coverup of the defects in the APU and harms associated with fume events, and failed to fix known defects in their products.

### Defendant Frontier (as to Plaintiff Linda Kilkenny Only)

32.    Defendant Frontier Airlines, Inc. ("Frontier") is a Colorado corporation and maintains a principal place of business at 4545 Airport Way, Denver, Colorado 80239, and a registered agent at Corporation Service Company, 1900 W Littleton Boulevard, Littleton, Colorado 80120.

33.    Defendant Frontier is a common carrier under 14 C.F.R. Part 121 engaged in the business of transporting passengers for hire by air and, in furtherance thereof, operates regularly scheduled flights.

5

34.    As a common carrier, Defendant Frontier is responsible to monitor and report fume events and to protect all onboard each flight it operates, including the subject flight.

35.    Defendant Frontier operates a fleet of Airbus 320 and Airbus 321 aircraft that are equipped with Honeywell auxiliary power units ("APU's").

36.    Defendant Frontier has experienced numerous "fume events" for decades, which are incidents in which dangerous toxic chemicals are released into the cabin of the aircraft.

37.    Despite this, Defendant Frontier denies the injuries that result from fume events, which results in denial of workers' compensation benefits to its flight crew, which also serves as a deterrent from disclosing all fume events that occur within its fleet.

38.    Defendant Frontier adopted a culture of brushing issues of fume events and resulting injuries under the rug.

39.    To that end, Defendant Frontier failed to provide guidance on how to detect or respond to fume events, and never provided training on fume events until January, 2025, long after the subject fume event.

40.    Plaintiffs were injured in fume events on Frontier flights that utilized the Airbus A320neo, and Honeywell APU's.

**JURISDICTION AND VENUE**

41.    Defendant Frontier maintains its principal place of business in the City and County of Denver, State of Colorado.

42.    The subject aircraft was based in Denver, and was heading from Denver to San Antonio, and was scheduled to return to Denver.

6

43. The Airbus and Honeywell Defendants conduct regular and systematic business in the State of Colorado, sold the subject aircraft and components to Frontier in the State of Colorado and also promulgate emails, service letters, service directives, and other information for use in aircraft applications in the State of Colorado.

44. The Airbus Defendants sold the Airbus family of aircraft, including the subject A320 and A321 models, to Frontier, which is based in the State of Colorado.

45. The Airbus Defendants and the Honeywell Defendants investigated, coordinated, engaged in a continuous course of conduct, and conspired together to keep the severity and frequency of fume events that were occurring in the Airbus Defendants' fleet of aircraft from the FAA, crewmembers, and flying public.

46. All Defendants have engaged in tortious activity in concealing the nature of fume events from the FAA, Plaintiffs, and public through its business relationship centered in Colorado.

47. All Defendants engaged in continuous and systematic business activities in the State of Colorado, including but not limited to, transacting business, contracting to supply goods and services, and engaging in tortious conduct in the State of Colorado.

48. All Defendants delivered their goods and services into the stream of commerce with the expectation that they would be purchased and used in the State of Colorado.

49. All Defendants derive substantial revenue from their business and activities directed at the State of Colorado, and avail themselves of the privilege of doing business in the State of Colorado such that jurisdiction is appropriate here.

50. All Defendants have entered into contracts and warranty agreements with individuals and entities located in the State of Colorado.

7

51.    As the holder of the Type Certificate with the continuous responsibility to ensure the continuing airworthiness of various aircraft, the Airbus Defendants maintain direct relationships and contact with the owners within the State of Colorado, including Frontier.

52.    As the PMA holders with continuous responsibility to ensure the continuing airworthiness of the aircraft, and components, and APU, the Honeywell Defendants maintain direct relationships with owners and operators within the State of Colorado, including Frontier.

53.    All Defendants advertise in the State of Colorado and advertise to Colorado customers.

54.    The contacts that each Defendant maintain in Colorado give rise to and caused the fume events at issue in this case.

55.    Thus, Jurisdiction and venue are appropriate in this Court.

56.    Jurisdiction is proper pursuant to C.R.S. § 13-1-124 because all Defendants transact business within this state and committed tortious acts within this state.

57.    Jurisdiction is proper pursuant to C.R.S. § 13-1-124 because all defendants committed tortious acts with respect to the accident aircraft within this state.

58.    Jurisdiction is proper pursuant to C.R.S. § 13-1-124 because the subject aircraft was based in Colorado.

59.    Jurisdiction is proper pursuant to C.R.S. § 13-1-124 because they contracted to insure persons, property or risks residing or located within this state at the time of contracting.

60.    Venue is proper in this Honorable Court pursuant to C.R.C.P. 98(c) and *Hernandez v. Downing,* 154 P.3d 1068, 1069 (Colo. 2007).

## FACTUAL BACKGROUND

8

### *The Subject Fume Event*

61.     On November 9, 2023, Frontier was operating an Airbus 320neo, Tail Number N303FR, referred to as "Poppy the Prairie Dog," on Flight 990 from Denver to San Antonio to when it experienced a fume event.

62.     A photography of the subject aircraft is shown below:



63.     The aircraft was scheduled to fly from San Diego to Denver, with a brief ground stop, then to San Antonio back to Denver.

64.     Plaintiffs were two of four flight attendants on the subject flight.

65.     After the ground stop in Denver en route to San Antonio, the flight attendants noticed a smell like someone was painting their nails, citronella, or dirty socks, which started in the rear of the aircraft and then spread throughout the cabin.

9

66.    The flight attendants started to feel sick, and notified the pilots at approximately 10:50 a.m.

67.    The pilots declared an emergency and requested an emergency response team to meet the aircraft when it landed in San Antonio at approximately 1:50 p.m.

68.    The pilots used Oxygen masks following the fume event, but Oxygen masks are not provided to the flight attendants or passengers in the cabin.

69.    When the aircraft arrived in San Antonio, they were met with the San Antonio Fire Department, with equipment that signaled fumes according to witnesses, but denied any odors were found.

70.    The flight attendants sat on the jetway for the next 6 hours waiting for medical attention, and all onboard had high carbon monoxide levels in their blood, even after 6 hours waiting.

71.    Defendant Frontier incorrectly stated that the odor was contained in the back of the aircraft, and no passengers were affected, as no investigation was done on the passengers.

72.    All of the flight attendants onboard the subject flight went to the hospital, with symptoms such as shortness of breath and headaches.

73.    Defendant Frontier was quoted as incorrectly telling the press that the flight attendants were "evaluated by emergency medical personnel as a precaution" but no one had gone to the hospital. (https://www.usatoday.com/story/travel/airline-news/2023/11/10/hazmat-team-odor-frontier-airlines-flight/71535223007/)

10

74. Six to seven hours following the fume event when the flight attendants were at the hospital, Plaintiff Linda Kilkenny had a 7.2 carbon monoxide level, and Plaintiff Lita McKay had a carbon monoxide level of 8.4, indicating carbon monoxide poisoning.

75. Plaintiff Lita McKay experienced numbness in her face, tongue, mouth and lips for 24 hours, lumps on her body, brain fog, fatigue, anxiety, headaches, and blurred vision.

76. Frontier tried to get the crew to ferry back to Denver, but the Captain denied Frontier's request.

77. Frontier mechanics changed the oil.

78. Only the next day on November 10, 2023, the subject aircraft flew from San Antonio to Denver and then subsequently returned to its regular schedule.

79. The subject aircraft also had a fume event approximately a week prior to the subject flight.

80. Plaintiffs took a Southwest flight back to Denver following this event.

81. Within 24 hours, all members of the inflight had to sign an Aviation Safety Action Program (ASAP) Report and submit an incident report concerning the fume event.

82. Since the fume event, additional symptoms became evident including shortness of breath, headaches, blurred or deteriorated vision, coughing, and brain fog.

83. However, Plaintiffs have been denied workers' compensation, based on Frontier's refusal to acknowledge a work related injury caused by the fume event.

84. At the time of the incident, Linda Kilkenny was 64 years old and a flight attendant for 40 years, and was with Frontier since January 5, 2004.

11

85.    As a result of this incident, Plaintiff Linda Kilkenny has suffered the following damages:

a.    Bodily injury;

b.    Disability;

c.    Pain and suffering;

d.    Mental anguish;

e.    Loss of the capacity for the enjoyment of life;

f.    Medical expenses;

g.    Lost past earnings and net accumulations;

h.    Lost future earnings and net accumulations;

i.    Pre-judgment interest;

j.    Post-judgment interest; and

k.    Other damages to be determined at trial.

86.    But for this incident, Plaintiff Linda Kilkenny would not have sustained the serious injuries and damages set forth above.

87.    At the time of the incident, Plaintiff Lita McKay was 65 years old and a flight attendant since April 29, 2002.

88.    Plaintiff Lita McKay experiences periodic brain fog, blurry vision, itchy skin on her legs, arms, and scalp, high blood pressure, and shortness of breath.

89.    As a result of this incident, Plaintiff Lita McKay has suffered the following damages:

a.    Bodily injury;

12

b.      Disability;

c.      Pain and suffering;

d.      Mental anguish;

e.      Loss of the capacity for the enjoyment of life;

f.      Medical expenses;

g.      Lost past earnings and net accumulations;

h.      Lost future earnings and net accumulations;

i.      Pre-judgment interest;

j.      Post-judgment interest; and

k.      Other damages to be determined at trial.

90.     But for this incident, Plaintiff Lita McKay would not have sustained the serious injuries and damages set forth above.

### *What is a Fume Event?*

91.     The Airbus 319, 320 and 321 models draw in air from the outside through their engines, and send it into the aircraft cabin through the bleed air system, as shown in the illustration below:

13



92. The bleed air system takes the air from the engine's compressor section and auxiliary power unit ("APU") to various parts of the aircraft and is used for pressurization and air conditioning, among other functions.

93. As noted in the DOT/FAA/AM-15/20 publication, "[t]he quality of air distributed throughout the cockpit and cabin during air transportation in a pressurized aircraft is critically important to human health."

94. A "fume" event is when the cabin air becomes contaminated with aerosolized or pyrolyzed engine oil, lubricants, deicing or hydraulic fluid due to a breach in the bleed air system.

95. The term "fume" describes both visible and invisible emissions that may or may not be detectable through bodily senses.

96. These toxic chemicals include TriCresyl Phosphates ("TCP"), N-phenyl-L-naphthylamine ("PNA"), and carbon monoxide ("CO").

14

97.    TCP is frequently used as an additive in engine oil, which can be toxic when inhaled.

98.    Carbon monoxide has no odor, taste, or color that comes from burning fuels, and can cause poisoning when it builds up in the blood.

99.    According to the Mayo Clinic, when excessive carbon monoxide is in the air, it replaces oxygen in the red blood cells, which can lead to serious tissue damage or death.

100.    Symptoms of carbon monoxide poisoning can include: headache; weakness; dizziness; nausea or vomiting; shortness of breath; confusion; blurred vision; sleepiness; loss of muscle control; and loss of consciousness.

101.    The inhalation of these toxic substances can cause a physiological and psychological disorder, "aerotoxic syndrome," which is uniquely present in those flying on aircraft that have been exposed to these chemicals.

102.    These injuries worsen with repeated exposures to fume events, such as those Plaintiffs experienced.

103.    Engine oil may be encountered if there was an oil leak or if oil has been absorbed into the bleed air and air conditioning system.

104.    Cabin odors come from different sources and have been described as dirty sock crayon, citronella, magic marker, acrid, wet dog, musty, as well as other smells.

105.    Also, some toxic fumes, such as carbon monoxide, are odorless.

106.    HEPA filtration does not work on the air because it only addresses particulates, and not toxic fumes, so Defendants' attempt to resolve the fume event issue with HEPA filtration is useless.

15

107.    Inhalation of toxic cabin air can cause serious and permanent injuries to those who breathe it, which is what injured Plaintiffs in this matter.

108.    Some short-term health effects include irritation of eyes, nose, and throat, headaches, dizziness, and tingling in the hands, feet, and face.

109.    Some symptoms of long-term effects include neurological symptoms such as headaches, fatigue, weakness, problems with balance, pain, numbness, brain fog, memory problems, psychological symptoms such as depression, anxiety, and poor concentration, and skin problems, including respiratory or gastrointestinal issues.

110.    EASA regulations require that "Crew and passenger compartment air must be free from harmful or hazardous concentrations of gases."

### *Chronology of Fume Events*

111.    The history of fume events in aircraft manufactured by the Airbus Defendants that utilize the Honeywell APU, and operated by Frontier extends back decades, and has long been a problem that is well known to all Defendants.

112.    Unfortunately, due to the lack of honest reporting on behalf of Defendants, retaliatory practices and misinformation they provide to crewmembers, many events go uncounted for.

113.    Defendants are motivated by profit by keeping the fleet out of maintenance, and downplay the extraordinarily serious and dangerous nature that fume events pose, and gaslight those who raise these fume events as a concern, as the following chronology illustrates:

*1950's*

16

114.    In the 1950's, after a series of fume events that adversely affected the health of those onboard, studies have shown that human exposure to cabin air could result in illness.

*1988*

115.    On December 8, 1988, the Airbus Defendants reissued Service Information Letter 26-015 (original version dated October 20, 1987) applicable to the A300, A310, and A300-600 Aircraft concerning "Avionics or Battery Spurious Smoke Warnings Subsequent to Air Conditioning System Contamination or Incorrect System Installation" in response to several Airbus operators experiencing smoke warnings on the ground, during take-off, or in cruise.

116.    The Airbus Defendants noted, "This can be caused by burnt oil, hydraulic fluid or dust contamination of the air conditioning system or by incorrect installation of detectors and ventilation system."

117.    The Airbus Defendants continued:

On all Airbus wide bodies, avionics or batteries are ventilated to various extent by fresh air from the aircraft air conditioning packs.

The aircraft packs are supplied with hot high pressure air from the engines or APU, these operate at high temperatures and are subject to the various contamination sources given below:

● APU - Internal and external oil leaks or presence of grease inducts after APU change.
● Engines - Internal oil leaks and presence of grease in ducts after engine replacement.
● Ground carts - Internal oil leaks.
● Hydraulic system - pressurization line non return valve leakage/failure and hydraulic reservoir overfilling.
● De-icing fluid ingestion by engines during winter season.
● External fumes ingested by engines or APU.

17

118.    The Airbus Defendants stated that they have worked to eliminate the contamination sources and to minimize the inconvenience caused to operators.

*1994*

119.    In 1994, Congress passed the Public Law, 103-305, § 304, "Aircraft Cabin Air Quality Research Program" to establish a program to determine "(1) what, if any, aircraft cabin air conditions, including pressure altitude systems, on flights within the United States are harmful to the health of airline passengers and crew, as indicated by physical symptoms such as headaches, nausea, fatigue, and lightheadedness; and (2) the risk of airline passengers and crew contracting infectious diseases during flight."

120.    This Law also required the FAA to contract with the Center for Disease Control to carry out studies on harmful conditions experienced on domestic flights, what changes can be made to reduce or eliminate the risk of illness, and to establish a long-term research program to study potential health problems to passengers and crew.

*1999*

121.    In 1999, "aerotoxic syndrome" was termed to explain the health effects of crew and passengers resulting from contamination in an aircraft.

*2001*

122.    Honeywell investigated the event and found the APU's Load Compression Carbon Seal was worn.

123.    As a result of the worn seal, the oil leaks in the APU Load Compressor air path and into the ECS.

18

124.    Oil accumulates in the ECS, which worsens over time, especially during all phases of flight.

125.    As discussed in 2001-T040, Honeywell performed an investigation of APU carbon seals that were under-going shop repair and was supposed to advise of findings and corrective action.

126.    All Defendants were on notice of these events that occurred over 20 years ago, but no adequate corrective action has been taken by them to date.

*2004*

127.    In 2004, Boeing introduced a safer alternative design in the Boeing 787 Dreamliner, which uses a dedicated air inlet instead of a bleed air system, which in turn eliminates the risks associated with the bleed air system.

*2007*

128.    The Aerotoxic Association was established to raise awareness of toxic air exposure in aircraft and Aerotoxic Syndrome victims.

*2010*

129.    On December 19, 2010, an Airbus 319 operated by Germanwings experienced a fume event where both pilots were almost fully incapacitated and landed with the last bit of mental capacity.

*2011*

130.    On January 6, 2011, the FAA issued InFO 11002 "Smoke/Fumes in the Cabin/Cockpit of Transport Category Aircraft" that discusses the approximately 900 smoke or fume events that occur annually in transport category airplanes.

19

131.    The FAA requested operators to put special emphasis on the smoke events data and track separately for trend analysis.

132.    The FAA also "recommended that documentation from each event be reviewed and maintenance and inspection requirements be updated regularly."

133.    "Air carrier/operators should ensure all data is used to definitively resolve and thereby reduce incidents of smoke and fumes entering the aircraft."

*2012*

134.    In 2012, "Congress directed the FAA to initiate a study of air quality in aircraft cabins to: 1) assess bleed air quality on the full range of commercial aircraft operating in the United States; 2) identify oil-based contaminants, hydraulic fluid toxins, and other air toxins that appear in cabin air and measure the quantity and prevalence, or absence, of those toxins through a comprehensive sampling program; 3) determine the specific amount and duration of toxic fumes present in aircraft cabins that constitutes [sic] a health risk to passengers; 4) develop a systematic reporting standard for smoke and fume events in aircraft cabins; and 5) identify the potential health risks to individuals exposed to toxic fumes during flight ."

135.    Congress further directed the FAA, to the extent practicable, "implement a research program for the identification or development of appropriate and effective air cleaning technology and sensor technology for the engine and auxiliary power unit bleed air supplied to the passenger cabin and flight deck of a pressurized aircraft" (Public Law 112-95, 2012).

136.    Since then, the Airbus Defendants have been monitoring air quality in real time.

137.    On October 9, 2013, an Airbus A320-200, N213FR, Frontier Flight 419 from Washington National, DC to Denver, Colorado, with 171 people on board was en route when passengers noticed a foul odor on board, and the crew reported hydraulic problems.

138.    Flight 419 was diverted to Indianapolis about 45 minutes later.

*2015*

139.    On July 17, 2015, an Airbus A319-100, FAA Registration NK-708 from Chicago to O'Hare, Illinois to Boston, Massachusetts operated by Spirit Airlines experienced a fume event, which left the captain sunk into his seat and incapacitated. The flight crew landed the aircraft without recalling how they managed to taxi or land the aircraft.

140.    The flight crew rested in the hotel for the evening, and flew two more legs after that, and when they later went to the hospital, both pilots had abnormal blood levels consistent with ToCP poisoning and internal bleeding.

141.    After returning to work, the captain continued to show symptoms of poisoning, and died on September 5, 2015 as a result of a heart attack, which is consistent with long term exposure to contaminated fumes in the aircraft according to scientific studies.

142.    The FAA received a FOIA request, but responded that it had no records of this fume event.

143.    The first officer aboard the July 17, 2025 flight gave a presentation at the pilot's association APA (Allied Pilot's Association) on October 17, 2016 concerning fume events, which is discussed below.

144.    In November 2015, the FAA issued a Report titled "Aircraft Cabin Bleed Air Contaminants: A Review", which stated:

21

The quality of air distributed throughout the cockpit and cabin during air transportation in a pressurized aircraft is critically important to human health. Since 1984, public law in the United States has directed research in cabin air quality, including investigation of health risks among individuals exposed to toxic fumes during flight.

Quantification of the potential health risks associated with exposure to bleed-air contaminants in cabin air is not possible without broad identification and measurement of the representative hazardous constituents of bleed air during contaminated air events. Such broad identification and measurement does not exist.

145.     The Report further recognized "[e]xposure to particles may result in a variety of health effects that range from irritation of eyes, nose, and throat to respiratory and other system disorders."

146.     The Report mistakenly described fume events as a "rare occurrence".

147.     The FAA noted that the information available was lacking, and those in the field, including Defendants, needed to assist in the following:

- the ongoing study of air quality in aircraft cabins through a comprehensive sampling program for broad characterization and evaluation of the constituents of contaminated bleed air;

- assessment of bleed air quality on the full range of commercial aircraft operating in the U.S.;

- continued assessment of health risks to passengers who maybe exposed during bleed air events;

- continued development of instrumentation for sensing bleed air and cleaning contaminated air in pressurized aircraft cockpits and cabins;

- continued development and evaluation of current measurement technologies both on the ground and in flight; and

- development of a systematic reporting standard for contaminated bleed air events.

22

148. The FAA concluded: "Quantification of the potential health risks associated with exposure to bleed-air contaminants in cabin air is not possible without broad identification and measurement of the representative hazardous constituents of bleed air during contaminate air events."

149. Unfortunately, fume events are not "rare occasions" as the FAA mistakenly reported, and are systematically and deliberately underreported through a series of tactics among the defendants in this case as detailed throughout this complaint.

*2016*

150. According to the September 13, 2025 Wall Street Journal article, "Toxic Fumes are Leaking Into Airbus, Sickening Crews and Passengers" Airbus changed its maintenance practices for fume events in 2016.

151. Prior to this change, Airbus required an inspection and deep-clean following a fume event.

152. According to the Airbus manual from 2016, Airbus cautioned that if the foregoing procedures were not followed, that the aircraft would experience "repeated encounters". *Id.*

153. Under the relaxed standards, no such requirements were in place if the smell was not strong and if the fume event had not occurred in the last 10 days. *Id.*

154. While Airbus was aware that lapsed maintenance practices would result in "repeated encounters," it changed the requirements anyway. *Id.*

155. Airbus was quoted:

> [Frontier] have experienced a number of transient oil or "sweaty sock" odours which are a minor comfort issue. When entering the relevant [troubleshooting manual] procedure, the maintenance procedures required for troubleshooting and

23

rectification seem to be out of proportion to a transient odour causing a minor comfort issue.

*Id.*

156.    On October 17, 2016, the first officer aboard the July 17, 2015 Spirit Airlines Flight from O'Hare to Boston, which experienced a fume event that took the life of the Captain gave a presentation to the Allied Pilots Association in which he discussed the following information about fume events:

a.    The Kansas State University's research revealed that there have been 5.3 fume events per 24,000 daily flights in the USA or 1955 fume events a year, with only 6 fume events getting reported to the FAA per year.

b.    During production flights, the Airbus Defendants received reports of odors, and flight test engineers sometimes reported about physiological symptoms, such as respiratory issues or eye irritation for example.

c.    The Airbus Defendants developed an In-Flight Cabin Air Analysis Project.

d.    Symptoms range from dizziness, fatigue, sweating, headaches, inability to concentrate, cognitive impairment, weakness, anxiety, tremors, pupil constriction, and chest tightness in mild poisoning.

e.    In addition, in moderate poisoning symptoms include salivation, lacrimation, abdominal cramps, nausea, vomiting, slow pulse, bradycardia, low blood pressure, and muscle tremors.

f.    Severe poisoning symptoms include non-reactive pupils, twitching, wheezing, bronchial secretion, difficulty breathing, cough, pulmonary edema, cyanosis,

24

diarrhea, loss of sphincter and urinary bladder control, tachycardia, high blood pressure, convulsions, coma, heart block and possibly death.

g.    Symptoms generally onset within 5 to 60 minutes, but in some individuals, may not develop for 24-48 hours, neurologic symptoms can take even longer.

h.    TCP is an organophosphate, which were developed for use in pesticides and never agents, and most are neurotoxic.

i.    TCP is used as an additive to aviation engine oils to reduce wear and to stabilize the engine temperature.

j.    TCP is not intended for consumption and can cause acute symptoms include stomach cramping, muscle aches and sinus congestion which may be mistaken for flu or food poisoning and can lead to delayed onset of OPICN (OrganoPhosphate Induced Chronic Neurotoxicity).

k.    A captain and a first officer were diagnosed with "Effects from Cholinergic drug" after exposure to oil fumes.

l.    Before smoking on the airlines was banned, fumes were often masked by cigarette smoke in the cabin.

m.    Hypemic Hypoxia can occur as result of exposure to carbon monoxide, which causes the reduced ability for the blood to carry oxygen.

n.    Smoke events are required to be reported except those not accompanied by visible smoke are only required to be reported when associated with a mechanical discrepancy and inflight (*not at the gate*), unless flight safety could be compromised.

25

o.    Lack of training, poor understanding, underreporting and weak FAA regulations prevent the FAA from adequately stating the problem.

p.    Most Fume/Smoke Checklists do not correctly address environmental control system fumes.

q.    Alternative solutions include non-bleed aircraft, such as the Boeing 787, or non-bleed conversions or installations.

*2017*

157.    On June 2, 2017, an Airbus A320, Frontier Flight 1630 from Los Angeles to Orlando experienced an air quality event accompanied with physical distress, passing out, choking, coughing, and eye irritation from the passengers, which required an emergency landing in Phoenix, Arizona.

158.    In September 2017, researched introduced at the "International Aircraft Cabin Air Conference 2018" in London, shows that the cabin air can be contaminated on each flight, regardless of whether odors or health effects are present.

159.    On November 22, 2017, an Airbus A320-200, N218FR, Frontier Flight 1686 from Las Vegas, Nevada to Nashville, Tennessee, with 178 passengers and 6 crew members, was en route when the crew reported an odor in the cockpit and diverted to Albuquerque.

*2018*

160.    Following a fume event in which a flight attendant on an Airbus aircraft became ill in early 2018, an FAA safety inspector shared concern and wrote: "These toxic chemicals are present in today's modern synthetic jet oils and are passing into the aircraft cabin/cockpit

26

unfiltered, affecting the air that crew and passengers breathe in." *September 13, 2025 Wall Street*

*Journal Article.*

161.    On March 26, 2018, the FAA issued Safety Alert for Operators 18003 "Procedures

for Addressing Odors, Smoke and/or Fumes in Flight" which provided:

> **Discussion:** Air carriers should ensure their procedures and checklists specifically address recognition, differentiation and mitigation of odors, smoke and/or fumes in the cabin and/or flight deck. Odors, smoke and/or fumes may be introduced to the cabin atmosphere as a result of aircraft equipment malfunction/failure or by inadvertent or intentional actions. While the presence of an odor alone does not necessarily require crew action or medical response, events involving odor, smoke and/or fumes require targeted and timely action to protect aircraft occupants.
>
> **Recommended Action:** Operators, under their existing Safety Management System structure, should review their company's odor, smoke and/or fumes procedures to ensure they address benign odor events as well as toxic odor, smoke and/or fumes, in an expeditious manner to limit exposure of passengers and crew. Operators should:
>
> • Review International Civil Aviation Organization Document 9481 (2017-2018 Edition), titled Emergency Response Guidance for Aircraft Incidents Involving Dangerous Goods, which recommends emergency responses to fire, explosion, spillage, or leakage, specific for over 3500 dangerous goods;
>
> • Assess current policy and procedures regarding odor, smoke and/or fumes recognition, differentiation and mitigation;
>
> • Collaborate with original equipment manufacturers, other operators and regulators to continuously enhance mitigation procedures and to identify potential risks; and
>
> • Create guidance for crews including, when appropriate, security information which can be disseminated through appropriate internal channels (e.g. Sensitive Security Information bulletins, manuals, etc.) as specific concerns are identified.

*2018*

27

162.    On May 14, 2018, an Airbus A319-100, N927FR, Frontier Flight 1286 from Denver, Colorado to Chicago O'Hare, Illinois, was climbing out of Denver when the crew reported an unidentified odor on board and returned back to Denver 55 minutes after departure.

163.    On May 20, 2018, an Airbus A320-200, N223FR, Frontier Flight 1839 from Tulsa, Oklahoma to San Diego, California, with 129 passengers and 6 crew members was en route when the crew diverted to Alburquerque, New Mexico, due to a chemical odor in the rear of the cabin, and landed about 40 minutes later.

164.    The flight was cancelled and the passengers were rebooked for flights the next day and had to stay in hotels.

165.    On May 27, 2018, an Airbus A320-200, N238FR, Frontier Flight 1764 from San Diego, California to Tulsa, Oklahoma was en route when an odor inside of the cabin caused the flight to be diverted to Phoenix, Arizona, about an hour into the flight.

166.    Seventeen people were examined at the gate, and a 62-year-old man was taken to the hospital.

167.    On August 15, 2018, an Airbus 321-200, N715FR, Frontier Flight 1674 from Orlando, Florida to Philadelphia, Pennsylvania with 230 passengers and 7 crew members was en route when the crew decided to divert the flight to Raleigh due to an unknown cabin odor, accompanied by sick passengers and crew.  Seven passengers and a flight attendant were treated at the airport, and 2 of the passengers, including an infant, and the flight attendant were sent to the hospital.

28

168.    On November 1, 2018, an Airbus A321-200, N702FR, Frontier Flight F9-1851 from Islip, New York to Myrtle Beach, South Carolina, with 218 passengers onboard was climbing out of Islip when the crew stopped climbing and landed 15 minutes later.

169.    The crew declared an emergency due to fumes in the cockpit.

170.    One crew member and 2 passengers were taken to the hospital for medical evaluation, and 7 passengers were treated at the airport.

171.    Frontier reported that the odor was detected in the cabin, there was no smoke, and the aircraft landed safely.

### *2019*

172.    On January 1, 2019, an Airbus A321-200, N715FR, Frontier Flight 1397 from Cleveland, Ohio to Tampa, Florida, was en route when 6 passengers (4 adults and 2 children) became ill, vomited, and were nauseous.

173.    On September 19, 2019, Senator Richard Blumenthal and Congressman John Garamendi, sponsors of the *Cabin Air Safety Act of 2019*, wrote to another operator of A320 and A321 aircraft, about their concern about fume events, and questioned that operator about them.

174.    They also noted:

> that the proper term for these events, is either 'fume event' or 'cabin air safety event'. There have been reports that your company is reclassifying these as 'odor events' in an apparent attempt to skirt Federal Aviation Administration reporting standards, as well as local workers' compensation laws. This raises significant doubt regarding Frontier's intention to faithfully adhere to existing health, safety, and labor law.

### *2021*

175.    On October 23, 2021, an Airbus A320-200N, N304FR, Frontier Flight 1159 from Norfolk, Virginia to Orlando, Florida experienced a fume event onboard with 102 passengers

(including young children) and crew onboard, which prompted the flight to divert to Raleigh/Durham.

176. The aircraft was evacuated via slides.

177. On December 2, 2021, a Frontier flight from Las Vegas to San Antonio experienced a fume event that forced an emergency landing in El Paso.

178. Six passengers aboard that flight were ill.

179. Emergency services were told about a possible carbon monoxide leak.

180. Frontier reported that the aircraft diverted due to a medical emergency and fumes on board.

181. One passenger aboard the flight said that they were not made aware of what was going on, were not told that they were exposed to a carbon monoxide leak, and merely told if they feel nauseous or sick to let them know.

### 2022

182. On December 31, 2022, an Airbus A321, N702FR, Frontier Flight 111 from San Juan, Puerto Rico to Orlando, Florida, was about two hours into the flight while passing over the Bahamas and requested a diversion to Miami, Florida due to several illness onboard.

183. Eight crew members and one passenger reported dizziness and went to local hospitals.

184. This is the same aircraft that experienced the fume event in 2018 from Islip, New York to Myrtle Beach, Florida in which 1 crew member and 2 passengers were sent to the hospital, and 7 others were treated at the airport.

### 2023

30

185.    On September 19, 2023, an Airbus A321-200, N717FR, Frontier Flight 560 from Denver, Colorado (DEN) to Raleigh/Durham, North Carolina (RDU) with 160 people on board performed its initial climb before leveling off at 11,000 feet.

186.    About ten minutes into the flight, the inflight crew alerted the pilots that fumes filled the cabin, and they declared an emergency and returned to Denver about 30 minutes after departure.

187.    While some passengers and crew were seen by emergency medical services at the gate, there are no reports of anyone receiving medical treatment after being exposed to toxic chemicals.

*2024*

188.    On March 27, 2024, an Airbus A321-200N, N611FR, Frontier Flight 1759 from Charlotte, North Carolina to Orlando, Florida with 226 people on board, was preparing for departure at the gate.

189.    After a strong odor was detected on the aircraft, the captain issued an evacuation notice, and the passengers were evacuated via the slides and jetway in the front.

190.    Frontier stated that it was investigating the source of the odor and stated that there had been no visible smoke or fire.

191.    *Note – fume events more often than not occur without the presence of smoke or fire.*

192.    On November 12, 2024, the FAA issued InFO 24013, "Voluntary Reporting of Fume or Smoke Events Onboard Passenger-Carrying Aircraft Operating Under Title 14 of the Code of Federal Regulations (14 CFR) Part 121" to provide standardization for Part 121 service difficulty reports (SDR) for smoke, vapor, or toxic or noxious fumes utilizing the SDR System.

31

*2025*

193.   On January 7, 2025, the FAA stated that it is "committed to protecting the safety and health of passengers and cabin crews on our nation's airlines. The agency has strict cabin air standards, and studies have shown cabin air is as good or better than the air found in offices and homes. In rare instances, mechanical issues such as failures of an engine oil seal or recirculation fan bearings can cause fumes to enter the cabin. Airlines are required to report these instances to the FAA."

194.   The FAA further stated:

- The FAA requires airplane manufacturers to show that the crew and passenger compartment air is free from harmful or hazardous concentrations of smoke, vapor, or toxic or noxious fumes during normal operating conditions and in the event of any probable failure conditions.

- FAA regulations require airliners' ventilation systems to supply clean air to both passengers and crew members. Airplanes must be designed to provide the equivalent of 0.55 pounds of fresh air per minute per occupant, a ventilation rate that is consistent with other public environments.

- Most of today's large transport category airplane ventilation systems provide a mix of fresh air/engine bleed air and recirculated airflow. The mix is approximately 50 percent but can vary depending upon the flight altitude and power settings.

- Most U.S. commercial airplanes use High Efficiency Particulate Air (HEPA) filters in the recirculated airflow, which remove 99.97 percent of particulate material.

- While the FAA does not have a definition for a "fume event," airlines are required to file Service Difficulty Reports (SDRs) when smoke, vapor or noxious odors enter the cockpit or passenger cabin.

- The FAA, airplane manufacturers, and air carriers maintain cabin air quality by defining appropriate design standards, designing the environmental control systems to meet those standards, and conducting proper maintenance, respectively.

32

*Id.*

195.    On July 31, 2025, passengers were boarding a Frontier flight from San Francisco, California to Atlanta, Georgia when they began to notice a strange odor in the cabin that one passenger described as exhaust from an old diesel car.

196.    The flight attendant then asked if anyone on board was feeling nauseous or faint, and several passengers raised their hands.

197.    The flight returned to the gate and the aircraft was evacuated.

198.    Frontier spokesperson, Jennifer de la Cruz stated: "The original plane was thoroughly evaluated and no issues were identified," "No subsequent cabin odor events have occurred with the aircraft in question. It is possible the odor stemmed from ground equipment in operation at SFO."

199.    Frontier spokesperson de la Cruz also said the safety of passengers and crew members is "our top priority," such incidents are rare, and are taken "very seriously."

200.    Frontier further stated that it thoroughly evaluates aircraft to determine the causes of such incidents.

201.    On September 13, 2025, the Wall Street Journal issued "How the Journal Analyzed More Than One Million FAA Reports" which discussed the database that it created a database of more than one million "service difficulty reports" or "SDRs" from 2010 through mid-2025.

202.    These reports came from classified SDRs compiled by the Association of Flight Attendants – CWA union.

203.    The instances of fume events have increased from approximately 12 per million departures in 2014 to nearly 108 per million in 2024.

33

204.    Since aircraft lacked sensors, reporting of fume events relies upon the crew to notice and documentation of such events.

205.    Instances of fume events in Airbus have increased from 32% to 57% in that same period.

206.    The Wall Street Journal found instances of oil or hydraulic fluid contamination of the air supply which caused fumes to enter the cabin or flight deck.

207.    The Wall Street Journal also published "Toxic Fumes are Leaking Into Airplanes, Sickening Crews and Passengers" on September 13, 2025.

208.    This article cites an Airbus spokesperson mispresenting the safety of its aircraft said: "'Airbus aircraft are designed and manufactured according to all relevant and applicable airworthiness requirements'". *Id.*

209.    The article points out that while the FAA's website describes fume events as "rare" and cites the 2015 report that suggests that the rate was "less than 33 events per million aircraft departures", the Wall Street Journal uncovered more than double that number of service difficulty reports in 2024 in the U.S. alone. *Id.*

210.    The Wall Street Journal also notes that its review of the International Air Transport Association, the rate is about 800 per million departures. *Id.*

211.    Due to underreporting, that rate is likely to be even higher.

212.    The Wall Street Journal article notes that most of the fume event incidents occur in Airbus 320's. *Id.*

213.    The increase in Airbus fume event incidents increased starting approximately in 2016 when Airbus loosened its maintenance practices applicable to fume events in response to the

34

airlines' complaints that fume events were keeping their aircraft out of service, as described above.

*Id.*

214. According to this article, the aircraft lobby group encouraged their members to lobby against increased safety standards in 2022 at the risk of them being used in litigation. *Id.*

215. On June 18, 2025, an Airbus A321, N708FR, Frontier Flight 1824 from Orlando, Florida to San Juan, Puerto Rico, was returned to Orlando after an "unusual odor" filled the cabin which caused 4 crew members to receive medical treatment.

216. On September 25, 2025, 39 United States Congressional leaders wrote a letter directed to Administrator Bryan Bedford of the FAA outlining their concerns on fume events, which is set forth in full below:

> We write with concerns following recent reports of increased incidences of oil and hydraulic fluid fumes in the cabin and flight deck (fume events) on U.S. commercial aircraft.1 We are deeply concerned about the health risks and potential for comprised flight safety this exposure presents to our constituents, who you are responsible for protecting, and urge you to expeditiously implement the requirements laid out in the 2024 Federal Aviation Administration (FAA) Reauthorization law to ensure the safety of the flying public.
>
> As you know, nearly all commercial aircraft ventilation air supplied to the cabin and flight deck is first compressed either in the main aircraft engines or a small auxiliary engine in the tail. "Bleed air" comprises the majority of the air on most flights, the remaining portion having been recirculated throughout the aircraft. This "bleed air" design has dominated all aircraft markets since the early 1950s, and while aircraft have seals to prevent oils from leaching into the air bound for the cabin, these seals can wear and degrade allowing oil to be vaporized and releasing unknown quantities of contaminants into the air that passengers and crew members inhale.
>
> Recent reporting has indicated an uptick in fume events reported by flight crew members in the last year, though this issue has existed for decades.2 While this may be due in part to the recent change in guidance for airlines reporting fume events, there has been a stark increase over the last decade, with thousands of events reported to the FAA since 2010.

35

Furthermore, reports indicate that multiple airline crew members have been forced to leave their jobs as pilots and flight attendants following fume events where their exposure led to injuries; one doctor even noted that "matched the symmetrical injuries seen in soldiers exposed to chemicals in combat."4 This is also not a new phenomenon, with flight crew reporting injuries from these fume events for decades.

The 2024 FAA Reauthorization required the FAA to develop a standardized submission system for air carrier employees to voluntarily report fume or smoke events onboard passenger-carrying aircraft.5 This reporting system is required to, among others, include the type of aircraft, the intensity of the fumes or smoke, the duration of the fume or smoke event, and any required onboard medical attention for passengers or crew members. The law also requires the National Academies to issue recommendations on improving overall cabin air quality; as well as allows the FAA to issue rulemaking regarding training for flight and ground crew members, installation of onboard detectors, and airlines' response to fume and smoke events.

In light of recent reporting and investigations that show the extent of these events and the serious health impacts they can cause, we urge you to expeditiously complete the work of standing up this required reporting system and request an update on the implementation timeline. We also request that you take steps to create a similar reporting system for passengers to report fume or smoke events they experience to ensure that all concerning events are captured.

Fume and smoke incidents on commercial aircraft, the leading source of which being from oil and hydraulic fluid, are serious events with the potential for lasting consequences. It is vital that the FAA continue its strong oversight of aircraft to ensure crew member and passenger safety – this includes ensuring fume and smoke events are properly reported, investigated, and prevented. We welcome the opportunity to partner to keep our skies safe. We look forward to your prompt response.

1 Bejamin Katz, John West, and Andrew Tangel, *Toxic Fumes Are Leaking Into Airplanes, Sickening Crews and Passengers*, Wall Street Journal, (Sept. 13, 2025), *available at:* https://www.wsj.com/business/airlines/air-travel-toxic-fumes

2 *Id.*

3 Suzanne Rowan Kelleher, *FAA And Airlines Slow To Address Toxic Jet Fume Events On Planes*, Forbes, (Sept. 15, 2025), *available at:* https://www.forbes.com/sites/suzannerowankelleher/2025/09/15/faa-airlines-toxic-jet-fume-events/

36

4 *Supra* at 1.

5 *FAA Reauthorization Act of 2024*, Pub. L. No. 118-63.

## FIRST CLAIM FOR RELIEF
### Plaintiffs v. Airbus Defendants
### (Strict Liability)

217.    Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

218.    The Airbus Defendants are in the business of designing, manufacturing, testing, certifying, distributing, and selling aircraft, including the subject aircraft for each Plaintiff.

219.    They are also the holder of the Type Certificate Holders for the Airbus family of aircraft, including the subject aircraft.

220.    Defendants designed and tested the aircraft and certified that they were of adequate quality, strength, and construction.

221.    The dangerous defects which caused the injuries to Plaintiffs existed at the time they were first sold.

222.    Reasonable alternative designs that do not utilize a bleed air system were and are available, as well as retrofit kits, but Airbus failed to incorporate them them.

223.    The design defects which rendered the aircraft unreasonably danger and defective were, but are not limited to, the following:

   a.   Ventilation systems that allowed bleed air to enter the cabin with all passengers and crew members, which may be contaminated with dangerous toxins.

   b.   Lack of adequate air quality monitors, sensor, or alarms.

37

c. Lack of systems that would allow the flight crew to identify the source of the contaminated air or prevent the contamination of the cabin air.

d. Lack of adequate filters that would purify the cabin air to prevent bleed air contamination.

e. Use of a bleed air system for cabin air.

f. Failure to use an adequate APU design.

g. Failure to use appropriate APU seals.

h. Improper selection of the bleed air design and materials.

i. Failure to satisfy the air cabin quality requirements during certification through to the day of the fume event and today.

j. Failure to warn of the effects of the health risks associated with exposure to toxic chemicals due to fume events.

k. Failure to provide guidance to crew, inflight, and passengers on how to adequately recognize and respond to fume events.

l. Failure to implement procedures for operators to advise customers of the dangers associated with exposure to toxic chemicals in fume events such that they can receive appropriate medical treatment.

m. Failure to provide sufficient safety devices to protect the crew, flight attendants, and passengers in the event of a fume event.

n. Failure to adequately instruct on proper maintenance practices on its bleed air system.

38

o.  Failure to adequately instruct on proper maintenance practices on the aircraft following a fume event.

p.  Failure to adequately instruct on proper cleaning practices in the cabin following a report fume event.

q.  Failure to safeguard against fume events.

224.   The aforesaid inherent design defects increased the likelihood of injuries in the event of an accident, had no usefulness or desirability in their condition, and could have been rectified with alternative safer products for little to no cost.

225.   As a result of the design defect, Plaintiffs suffered injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

## SECOND CLAIM FOR RELIEF
### Plaintiffs v. Airbus Defendants
### (Negligence)

226.   Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

227.   The Airbus Defendants owed a duty to the Plaintiffs to use reasonable care in designing, manufacturing, testing, certifying, distributing, and selling aircraft.

228.   The Airbus Defendants breached their duties and were negligent, grossly negligent, reckless, willful and/or wanton in that they, among other things:

a.  The Airbus Defendants negligently designed, manufactured, tested, certified, distributed, and sold the subject aircraft, such that their ventilation systems allowed contaminated bleed air to enter the cabin of the subject aircraft.

39

b. The Airbus Defendants negligently designed, manufactured, tested, certified, distributed, and sold the subject aircraft without an adequate air quality monitor, sensor or alarm to detect bleed air contamination, allow the flight crew to identify the source of such contamination, or allow the flight crew to prevent fume events.

c. Ventilation systems that allowed bleed air to enter the cabin with all passengers and crew members, which may be contaminated with dangerous toxins.

d. Lack of adequate air quality monitors, sensor, or alarms.

e. Lack of systems that would allow the flight crew to identify the source of the contaminated air or prevent the contamination of the cabin air.

f. Lack of adequate filters that would purify the cabin air to prevent bleed air contamination.

g. Use of a bleed air system for cabin air.

h. Failure to use a non-bleed air system.

i. Failure to incorporate any retrofit of the bleed air system to prevent against fume events.

j. Failure to use an adequate APU design.

k. Failure to use appropriate APU seals.

l. Improper selection of the bleed air design and materials.

m. Failure to satisfy the air cabin quality requirements during certification through to the day of the fume event and today.

n. Failure to warn of the effects of the health risks associated with exposure to toxic chemicals due to fume events.

40

o. Failure to provide guidance to crew, inflight, and passengers on how to adequately recognize and respond to fume events.

p. Failure to implement procedures for operators to advise customers of the dangers associated with exposure to toxic chemicals in fume events such that they can receive appropriate medical treatment.

q. Failure to provide sufficient safety devices to protect the crew, flight attendants, and passengers in the event of a fume event.

r. Failure to adequately instruct on proper maintenance practices on its bleed air system.

s. Failure to adequately instruct on proper maintenance practices on the aircraft following a fume event.

t. Failure to adequately instruct on proper cleaning practices in the cabin following a report fume event.

u. Failure to safeguard against fume events.

v. Failing to adequately report instances of fume events to the FAA, regulatory authorities, operators, pilots, flight attendants, flight crews, and the flying public.

w. Hiding the hazards associated with the bleed air system used in its aircraft fleet.

x. Coordinating with others, including the Honeywell Defendants, to conceal the nature of defects associated with the bleed air system and the APU.

y. Intentionally withholding information from the FAA, regulatory authorities, pilots, flight attendants, flight crews, and the flying public.

41

z. Placing pilots, flight attendants, and passengers in harm's way by knowingly exposing them to risks of toxic chemicals and serious injuries from fume events, and failing to tell them about how to recognize, react, and treat when an exposure could exist.

aa. Causing pilots, flight attendants, and passengers who are exposed to fume events to go unaware of any risks of toxic exposure.

229. As a direct and proximate result of the conduct of the Airbus Defendants, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

230. As a direct and proximate result of the conduct of the Airbus Defendants, Plaintiffs will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

**THIRD CLAIM FOR RELIEF**
**Plaintiffs v. Airbus Defendants**
**(Breach of Express and Implied Warranties of Merchantability)**

231. Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

232. The Airbus Defendants expressly and impliedly warranted to its customers and foreseeable users of the product that it was safe, merchantable and fit for the uses for which it was intended.

233. The Plaintiffs relied upon such warranties.

234. The Airbus Defendants breached their warranties to the Plaintiffs when they designed, manufactured, tested, certified, distributed, and sold the subject aircraft that were not reasonably safe for its intended use or purpose.

235. As a direct and proximate result of the Defendants' breach, the Plaintiffs suffered and continue to suffer serious mental and physical impairments and have to endure past, present and future medical expenses, needed for aid and assistance in their abilities to enjoy life and attend to their usual activities.

236. The Airbus Defendants engaged in false representations concerning the severity and frequency of fume events.

237. The Airbus Defendants told Plaintiffs that the fume events were not harmful, and that their reaction was a product of emotional angst.

238. However, the Airbus Defendants knew the dangers associated with fume events, and failed to provide any disclosure, training, or information to Plaintiffs or the flying public about them.

239. The Airbus Defendants also failed to report instances of fume events and discouraged reporting so its aircraft were not down for service.

240. The Airbus Defendants also failed to provide the inflight crew or passengers with sufficient protective equipment.

241. The Airbus Defendants underreported fume events and created protocols to ensure that fume events were kept quiet.

242. The Airbus Defendants knew that the statements it made were false.

43

243.    Instead, the Airbus Defendants systematically covered up the facts, which caused serious and permanent injury to Plaintiffs.

244.    Plaintiffs, and each of them, relied upon the Airbus Defendants' statements, which turned out to be false.

As a direct and proximate result, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

## FOURTH CLAIM FOR RELIEF
### Plaintiffs v. Airbus Defendants
### (Negligent Misrepresentation and Fraud)

245.    Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

246.    The Airbus Defendants engaged in false representations concerning the severity and frequency of fume events.

247.    As set forth in detail above, defendant engaged in false representations and concealments which resulted in the Plaintiffs' injuries and damages.

248.    The Airbus Defendants told Plaintiffs that the fume events were not harmful, and that their reaction was a product of emotional angst.

249.    The Airbus Defendants failed to report instances of fume events and discouraged reporting so its aircraft were not down for service.

250.    The Airbus Defendants also failed to provide the inflight or passengers with sufficient protective equipment.

251.    The Airbus Defendants underreported fume events, and created protocols to ensure that fume events were kept quiet.

252.    The Airbus Defendants knew that the statements they made were false.

44

253.   Instead, The Airbus Defendants systematically covered up the facts, which caused serious and permanent injury to Plaintiffs.

254.   Plaintiffs, and each of them, relied upon The Airbus Defendants' statements, which turned out to be false.

255.   As a direct and proximate result, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

256.   As a direct and proximate result, Plaintiffs will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

## FIFTH CLAIM FOR RELIEF
### Plaintiffs v. Honeywell Defendants
### (Strict Liability)

257.   Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

258.   The Honeywell Defendants are in the business of designing, manufacturing, testing, certifying, distributing, and selling aircraft, including the subject APU.

259.   The Honeywell Defendants designed and tested the aircraft and certified that they were of adequate quality, strength, and construction.

260.   The dangerous defects which caused the injuries to Plaintiffs existed at the time they were first sold.

261.   The design defects which rendered the aircraft and APU unreasonably dangerous and defective were, but are not limited to, the following:

a.   Ventilation systems that allowed bleed air to enter the cabin with all passengers and crew members, which may be contaminated with dangerous toxins.

45

b.  Lack of adequate air quality monitors, sensor, or alarms on the APU.

c.  Lack of systems that would allow the flight crew to identify the source of the contaminated air or prevent the contamination of the cabin air.

d.  Lack of adequate filters that would purify the cabin air to prevent bleed air contamination.

e.  Failure to use an adequate APU design.

f.  Failure to use appropriate APU seals.

g.  Improper APU design and materials.

h.  Failure to satisfy the air cabin quality requirements during certification through to the day of the fume event and today.

i.  Failure to warn of the effects of the health risks associated with exposure to toxic chemicals due to fume events.

j.  Failure to provide guidance to crew, inflight, and passengers on how to adequately recognize and respond to fume events.

k.  Failure to implement procedures for operators to advise customers of the dangers associated with exposure to toxic chemicals in fume events such that they can receive appropriate medical treatment.

l.  Failure to provide sufficient safety devices to protect the crew, flight attendants, and passengers in the event of a fume event.

m. Failure to adequately instruct on proper maintenance practices on the APU or bleed air system.

46

n.  Failure to adequately instruct on proper maintenance practices on the APU or bleed air system following a fume event.

o.  Failure to safeguard against fume events.

262.  The aforesaid inherent design defects increased the likelihood of injuries in the event of an accident, had no usefulness or desirability in their condition, and could have been rectified with alternative safer products for little to no cost.

263.  As a direct and proximate result of the design defect, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

264.  As a direct and proximate result of the design defect, Plaintiffs will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

## SIXTH CLAIM FOR RELIEF
### Plaintiffs v. Honeywell Defendants
### (Negligence)

265.  Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

266.  The Honeywell Defendants owed a duty to the Plaintiffs to use reasonable care in designing, manufacturing, testing, certifying, distributing, and selling aircraft.

267.  The Honeywell Defendants breached their duties and were negligent, grossly negligent, reckless, willful and/or wanton in that they, among other things:

a.  The Honeywell Defendants negligently designed, manufactured, tested, certified, distributed, and sold the subject aircraft APUs.

b.  The Honeywell Defendants negligently designed, manufactured, tested, certified, distributed, and sold the subject APUs without an adequate air quality monitor, sensor or alarm to detect contamination, allow the flight crew to identify the source of such contamination, or allow the flight crew to prevent fume events.

c.  Ventilation systems that allowed bleed air to enter the cabin with all passengers and crew members, which may be contaminated with dangerous toxins.

d.  Lack of adequate air quality monitors, sensor, or alarms.

e.  Lack of systems that would allow the flight crew to identify the source of the contaminated air or prevent the contamination of the cabin air.

f.  Lack of adequate filters that would purify the cabin air to prevent bleed air contamination.

g.  Inadequate APU design and materials.

h.  Inadequate design and material selection of APU seals.

i.  Failure to provide adequate warnings or maintenance instructions concerning the APU and its seals.

j.  Failure to satisfy the air cabin quality requirements during certification through to the day of the fume event and today.

k.  Failure to warn of the effects of the health risks associated with exposure to toxic chemicals due to fume events.

l.  Failure to provide guidance to crew, inflight, and passengers on how to adequately recognize and respond to fume events.

48

m. Failure to implement procedures for operators to advise customers of the dangers associated with exposure to toxic chemicals in fume events such that they can receive appropriate medical treatment.

n. Failure to provide sufficient safety devices to protect the crew, flight attendants, and passengers in the event of a fume event.

o. Failure to adequately instruct on proper maintenance practices on the bleed air system, APU or its seals.

p. Failure to adequately instruct on proper maintenance practices on the bleed air system, APU or its seals.

q. Failure to safeguard against fume events.

r. Failing to adequately report instances of fume events to the FAA, regulatory authorities, operators, pilots, flight attendants, flight crews, and the flying public.

s. Hiding the hazards associated with the bleed air system used in its aircraft fleet.

t. Coordinating with others, including the Airbus Defendants, to conceal the nature of defects associated with the bleed air system and the APU.

u. Intentionally withholding information from the FAA, regulatory authorities, pilots, flight attendants, flight crews, and the flying public.

v. Placing pilots, flight attendants, and passengers in harm's way by knowingly exposing them to risks of toxic chemicals and serious injuries from fume events, and failing to tell them about how to recognize, react, and treat when an exposure could exist.

49

w. Causing pilots, flight attendants, and passengers who are exposed to fume events to go unaware of any risks of toxic exposure.

268. As a direct and proximate result, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

269. As a direct and proximate result, Plaintiffs will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

## SEVENTH CLAIM FOR RELIEF
### Plaintiffs v. Honeywell Defendants
### (Breach of Express and Implied Warranties of Merchantability)

270. Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

271. The Honeywell Defendants expressly and impliedly warranted to its customers and foreseeable users of the product that it was safe, merchantable and fit for the uses for which it was intended.

272. The Plaintiffs relied upon such warranties.

273. The Honeywell Defendants breached its warranties to the Plaintiffs when they designed, manufactured, tested, certified, distributed, and sold the APU's that were not reasonably safe and effective for its intended use or purpose.

274. As a direct and proximate result of the defendant's breach, the Plaintiffs suffered and continue to suffer serious mental and physical impairments and have to endure past, present and future medical expenses, needed for aid and assistance in their abilities to enjoy life and attend to their usual activities.

50

275.    As a direct and proximate result, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

276.    As a direct and proximate result, Plaintiffs will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

## EIGHTH CLAIM FOR RELIEF
### Plaintiffs v. Honeywell Defendants
### (Negligent Misrepresentation and Fraud)

277.    Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

278.    The Honeywell Defendants engaged in false representations concerning the severity and frequency of fume events.

279.    As set forth in detail above, the Honeywell Defendants engaged in false representations and concealments which resulted in the Plaintiffs' injuries and damages.

280.    The Honeywell Defendants told Plaintiffs that the fume events were not harmful, and that their reaction was a product of emotional angst.

281.    The Honeywell Defendants failed to report instances of fume events and discouraged reporting so its aircraft were not down for service.

282.    Defendants also provide faulty and defective APUs, which the Honeywell Defendants know are defective and risk the safety of anyone flying on an aircraft equipped with their APUs.

283.    The Honeywell Defendants underreported fume events, and failures in their APUs to ensure that fume events were kept quiet.

284.    The Honeywell Defendants knew that the statements they made were false.

51

285.    Instead, The Honeywell Defendants systematically covered up the facts, which caused serious and permanent injury to Plaintiffs.

286.    Plaintiffs, and each of them, relied upon the Honeywell Defendants' statements, which turned out to be false.

287.    As a direct and proximate result, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

288.    As a direct and proximate result, Plaintiffs will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

## NINETH CLAIM FOR RELIEF
### Plaintiffs v. the Airbus Defendants and Honeywell Defendants
### (Negligent Infliction of Emotional Distress)

289.    Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

290.    The Airbus Defendants and Honeywell Defendants owed duties to Plaintiffs, as described above.

291.    The Airbus Defendants and Honeywell Defendants' breach of duties proximately caused the accident and was a proximate cause of the emotional distress that naturally resulted to Plaintiffs as a result of Defendants' actions.

292.    Plaintiffs were flight attendants aboard the subject flights when the fume events occurred, and therefore experienced and observed the sequence of events that led to their injuries and were within the zone of danger of the accident, and witnessed the injuries sustained by passengers and fellow crew members.

52

293.    The impact left no doubt in Plaintiffs' minds that they would be injured, and they were.

294.    As a direct and proximate result of the Airbus Defendants and Honeywell Defendants' negligence and/or breach of contract, Plaintiffs suffered and continue to suffer emotional and physical injuries which were a direct result of the incident and were foreseeable to the Honeywell Defendants.

295.    Plaintiffs suffered the aforementioned injuries and damages as a direct result from the sensory and contemporaneous observance of the events and serious bodily injury.

## TENTH CLAIM FOR RELIEF
### Plaintiff Linda Kilkenny v. Defendant Frontier
### (Gross Negligence)

296.    Plaintiff Linda Kilkenny incorporate by reference the above paragraphs as though set forth at length herein.

297.    Defendant Frontier was the owner, operator and maintainer of the subject aircraft.

298.    Defendant Frontier failed to exercise reasonable care in the operation of the subject aircraft.

299.    Defendant Frontier through its representative, James E. Nides, stated under oath that it "maintains records in the regular course of its business relating to any suspected defects that are reported with respect to the fleet of aircraft it operates."

300.    Mr. Nides, further stated that Defendant Frontier maintains records relating to passenger communications with its customer relations department.

301.    Defendant Frontier was aware of numerous fume events that occurred on its aircraft, including those set forth above, as well as other instances that may be documented

internally pursuant to FAA instructions, and through Service Difficulty Reports, and other reports from the field.

302.    Defendant Frontier was also aware of the prior fume event on the subject aircraft, as each event is required to be recorded.

303.    Despite the knowledge of the most recent of the subject flight, Defendant Frontier did not take adequate action to protect future passengers and crew from injuries caused by fume events.

304.    Defendant Frontier also denied on numerous occasions, including instances under oath, that fume events occurred, and denied any mechanical issues during flights in which fume events were reported.

305.    In one toxic fume event that occurred on June 2, 2017, one of the passengers contacted Defendant Frontier about the flight, and was not notified that they were exposed to toxic chemicals, and merely offered a $200 voucher.

306.    Instead, Defendant Frontier acted deliberately to allow Plaintiff and others to fly on the subject aircraft, knowing that future fume events were likely to occur, thereby deliberately and intentionally injuring Plaintiffs when the subject fume event occurred.

307.    Further, Defendant Frontier failed to exercise reasonable care for the protection of their flight crew and passengers in the operation of the aircraft during the subject flights.

308.    Defendant Frontier failed to exercise reasonable care or take adequate corrective action to address the pervasive issue with fume events in its fleet that caused the injuries to Plaintiffs.

54

309.    Defendant Frontier breached its duty and was negligent, grossly negligent, reckless, willful and/or wanton in that it, among other things:

a.    failed to provide air transportation and protection in a manner reasonably calculated to ensure the safety of the flight crew and passengers on the subject aircraft and the safe completion of the subject flights;

b.    failed to safely transport the flight attendants and passengers;

c.    failed to adequately warn Plaintiff of the dangers of the subject flight;

d.    failed to maintain the subject in a safe manner;

e.    failed to own or operate the subject aircraft with due care and caution in accordance with applicable procedures and safe practices;

f.    failed to provide safe operating procedures, training, instructions, guidelines, and equipment for the incident flight;

g.    failed to exercise safe and effective control over the aircraft and to protect against unreasonable risk of injury;

h.    failed to equip the subject flight with adequate equipment to protect those aboard;

i.    failed to properly and adequately inspect, overhaul, repair, equip, modify, and maintain the subject aircraft;

j.    failed to exercise the high degree of care required of a common carrier in the exercise of its activities;

k.    failed to provide air taxi transportation and carriage in a manner reasonably calculated to ensure the safe completion of the subject flight;

l.    failed to report defects;

m.    failed to investigate or report fume events;

n.    failed to take corrective action to respond to and prevent fume events;

o.    discouraged reporting of fume events;

p.    concealed from pilots, flight attendants, and passengers from knowing that they were exposed to toxic chemicals during fume events;

q.    failed to provide or affirmatively offer adequate and appropriate medical services following a toxic chemical exposure;

r.    exposing those onboard its aircraft to toxic chemicals;

s.    failing to mitigate from the short term and long term harm that toxic chemical exposure presents to those who are exposed;

t.    taking affirmative action to insulate itself from ramifications that exposing those who fly on its aircraft may have for profit;

u.    carelessly, recklessly, and negligently failed to comply with applicable Federal Aviation Rules and Regulations;

v.    carelessly, recklessly, and negligently failed to comply with Part 121 of the Federal Aviation Rules and Regulations; and

w.    failed in other respects to be shown at trial.

310.    As a direct and proximate result, Plaintiffs sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

56

311.    As a direct and proximate result, Plaintiffs will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

**ELEVENTH CLAIM FOR RELIEF**
**Plaintiff Linda Kilkenny v. Defendant Frontier**
**(Negligent Misrepresentation and Fraud)**

312.    Plaintiff Linda Kilkenny incorporates by reference the above paragraphs as though set forth at length herein.

313.    Defendant Frontier intentionally engaged in false representations concerning the severity and frequency of fume events, in the face of service difficulty reports, internal reports, and knowledge of the propensity for fume events and the physical effects that toxic fumes caused from exposure.

314.    Defendant Frontier knowingly exposed everyone onboard each of its flight to the risk of toxic chemical exposure, and when they were exposed to fume events, failed to tell them and only asked if they were feeling okay.

315.    Defendant Frontier actively concealed from pilots, flight attendants, and passengers from knowing that they were exposed to toxic chemicals during fume events.

316.    Defendant Frontier only provided medical services to those onboard exposed to toxic chemicals – who often did not know they were exposed – if they requested it, and never advised them of the serious short term and long term health risks associated with fume events.

317.    Defendant Frontier failed to mitigate the short term and long term harm that toxic chemical exposure presents to those who are exposed.

318.    Defendant Frontier failed to protect its crew from the harm associated with toxic chemical exposure, especially when they are repeatedly subjected to fume events, which often times go unreported.

319.    Defendant Frontier has taken affirmative action to insulate itself from ramifications that exposing those who fly on its aircraft may have for profit.

320.    As set forth in detail above, defendant engaged in false representations and concealments which resulted in the Plaintiff's injuries and damages.

321.    Defendant intentionally told Plaintiff that the fume events were not harmful, and that their reaction was a product of emotional angst.

322.    After experiencing a fume event, Plaintiff Linda Kiklenny was subjected to injuries and damages.

323.    Defendant Frontier intentionally threatened all of the inflight that they could also be subject to disciplinary action and lost pay in similar circumstances.

324.    Defendant Frontier also knowingly failed to report instances of fume events and discouraged reporting so its aircraft were not down for service.

325.    Defendant Frontier also knowingly failed to provide the inflight or passengers with sufficient protective equipment.

326.    Defendant Frontier intentionally and knowingly underreported fume events and created protocols to ensure that fume events were kept quiet.

327.    Defendant Frontier knew that the statements it made were false.

328.    Instead, Defendant Frontier intentionally and knowingly systematically covered up the facts, which caused serious and permanent injury to Plaintiff Linda Kilkenny.

58

329. Plaintiff Linda Kilkenny relied upon Defendant's statements, which turned out to be false.

330. As a result, Plaintiff Linda Kilkenny was seriously and permanently injured.

331. As a direct and proximate result, Plaintiff Linda Kilkenny sustained injuries, damages, and losses, including economic damages, noneconomic damages, and damages for physical impairment.

332. As a direct and proximate result, Plaintiff Linda Killkenny will suffer future damages including economic damages, noneconomic damages, and damages for physical impairment.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor and against all defendants in an amount to be determined by the trier of fact, plus interest as provided by State law from the date of injury, and from the date of filing, plus costs of this action, including expert witness fees and post-judgment interest, and for such other and further relief allowed by law and as this Court deems just. Plaintiffs hereby reserve their conditional right, pursuant to C.R.S. § 13-21-102, to amend this Complaint to assert a claim for exemplary damages.

### PLAINTIFFS DEMAND A TRIAL TO A JURY OF SIX (6) PERSONS

DATED this 7th day of November 2025.

Respectfully submitted,

*Original signature on file with*
*Ciancio Ciancio Brown, P.C.*

*/s/ Loren M. Brown*

_____

Loren M. Brown, #34837
CIANCIO CIANCIO BROWN, P.C.
Attorney for Plaintiffs

59

Plaintiffs' Addresses:

Linda Kilkenny
267 Castaway Drive
Bluffton, South Carolina 29910

Lita A. McKay
1568 Sorenson Drive
Windsor, Colorado 80550